Good morning, Your Honors. May it please the Court, Stuart Grant v. the Appellant Oregon Public Employees Retirement Fund, Amalgamated Bank, and the Mine Workers Pension Scheme. With the Court's permission, I'd reserve four minutes for rebuttal. Sure. Your Honors, I think the briefing in this case is very detailed, both in the facts and the legal support. And if Your Honors have any questions, I'd be happy to specifically address them. I have one question. With respect to loss, the calculation of loss and the pleading applies to that, do you agree that Federal Rule of Civil Procedure 9b applies? To loss causation? Causation, right. No, I do not. You do not. And why not? No. Because I believe that 9b has to do with fraud and allegations of fraud or scienter. And those certainly 9b would apply to. But otherwise, I believe Rule 8 would apply. And that, and I think the Supreme Court has said that what you really need to do is you need to put the defendants on notice as to, you know, what the loss is and that it is reasonably related to the allegations of fraud. You agree, I gather, that with respect to many of the allegations that you have in your current Supreme Court and our law, and that was part of the problem you had with the district court. With that in mind, I guess you probably would agree we don't really have any direct authority in the Ninth Circuit that addresses whether 9b applies to loss causation. Is that your understanding as well? That is my understanding. But I think that the Supreme Court cases that we've cited do indicate that it's not. But I don't think the Ninth Circuit has. So you're saying that a good portion of the complaint, 9b clearly does apply, but it doesn't apply to loss causation. Your Honor has used the word good portion. I'm very. Be more specific. Well, no, I'm concerned about that because, you know, one of the issues here is I think that some of the accusations against the defendants are, you know, how and some of the or were not. You know, according to the defendants, everything they said is mere puffery. According to us, they're outright misstatements. So when we get into words that are not as as specific or exact, yes, there are certainly portions of the complaint, C enter, to which 9b, you know, definitely applies. There are also certain portions as to, you know, what did they do wrong? And I believe the false statements or, you know, the actual statements, we need to put them on notice. I believe loss causation, you know, is part of that notice pleading. How about your gap allegations? Do they have to be pled with specificity? Well, I think in general, things have to be pled with specificity. But, you know, the question is what degree of specificity? And, you know, part of the problem is, for example, in their opposition brief, they say, well, you know, you've told us that we didn't have enough of a reserve for bad debt. And, you know, you told us how much we had and that there wasn't enough. And here are the reasons. But you know what? You didn't say how much we should have had. And I'm thinking, OK, give me all the audit work papers and I'll go through and I'll tell you that. But really, in order to get into court, in order to have discovery, I got to tell you how much you should have had. And I have to do your auditing work under gap? That's where your insider comes in, doesn't it? Well, we had 12 of them. But what I don't have is access to their entire books and records, which kind of ties into some of the more general things that I wanted to talk to the court about, which is if there is to be securities litigation. And look, reasonable minds can differ whether there ought to be. And there's certainly members of the courts who think that it ought not to exist. But right now it does exist. And if it is to exist, the question is, what is the pleading standard or what is reasonable in the real world to expect of people so that the good cases, the ones where there's really bad acts, get before the court and judicial resources and private resources are spent to it? And the many bad cases, the gatekeepers keep them from going further. And the problem is, if you keep ratcheting the, you know, the rules, there's that old joke about, you know, the Titanic, you know, name the year in which it sunk, name the number of people that died on it, now name the people. When you get to that third question, it makes it practically impossible for anyone to plead a valid securities fraud. And I think that's the level at which the district judge held us to. And, you know, again, there needs to be a practical aspect. We have 12 confidential witnesses, which is almost unheard of. They come in every single level of the company. They testify to things that happen at meetings with senior executives, knowing what's going on, talking about marketing, talking about their efforts to bring, you know, more and more students in. The problems that they are really capitalizing on students who are unqualified, on the students who are at most risk, and making sure they're ill-informed, how are we supposed to tie that scienter? Because no one is going to come out and say, write a memo to say, boy, we really pulled it off this time. You know, with all my intent, we managed to get another 20% of students in who were completely unqualified. That- I guess I read the district court's opinion differently than you do. I thought that the district court, on your point, said that they did, in fact, disclose that they were seeking people who probably couldn't be admitted in a normal college setting, that they were a high credit risk. There was a big chance they were not going to make it through, and that it would have adverse financial impact. The judge seemed to find that they did comply with GAAP. I understand your point that you could say that, well, it wasn't a great business plan, and people can agree or not agree about that. But the point is, was there a breach of the securities laws that should yield a result in your favor? By saying what you're saying, I'm not sure it necessarily helps you, because the district court in this case said, okay, here's what they said. Was it false? And he says they said all they needed to make certain that it wasn't false. What's your thought about that? I think he just got it wrong. I think that if you, you know, I think we have a reference in our briefs, and I'm sorry, the briefing is so extensive I can't pull it out right now. We say they didn't even talk about, in any of their public disclosures until 2010, was the first reference they ever made to any kind of marketing whatsoever. In 08, 09, none of that was going on. And even then, it was, you know, very, very subtle. And I guess part of the problem is, you know, in hindsight, a district court going back can find a single disclosure. I think it again was in the 2010K where they said we've devoted, you know, considerable additional resources to marketing. That's very different, you know, in hindsight than when you're an investor. And in 2008, 2009, and 2010, you're being barraged with, you know, our growth is based on our success in the classroom. And we are, you know, we are putting out a high-quality product that the students really like, and things are going great. Very, very different impression taken as a whole. And I think part of the things that the district court did was look back, and I, you know, compliment my colleagues on the defense side for it, found select facts here and there in, you know, buried in 10Ks. But when you look at the total mix of information, it was simply false. That's not the, what was projected to the investors. I understand your argument, and you come on board with the disadvantage. There's no question about it. The PSLRA did weaken and intended to weaken the position of plaintiffs in these cases. So we've tried in our circuit to identify what we're going to look for. And in a very well-written case, Capital Glacier, Glacier Capital, we said, plaintiffs proceeding under the PSLRA can no longer aver intent in general terms or mere motive and opportunity or reckless, but rather must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent. Now, that seems to me to be clear and well-written. And that's what we want to find here, is not the generalities and the motive and the opportunity, but a degree of recklessness that strongly suggests actual intent. What would your argument be in answer to that? So my first answer would be, of course, that it was extremely well-written. Well-written. No doubt about it. No question. By Judge Wallace, I believe, right? Oh, I hadn't noticed that, Your Honor. I just, on its face, it was extremely well-written. I think the answer is a couple-fold to that. Again, I am never going to have, for Your Honor, a memo or an e-mail that says, boy, you know, the Perry Mason moments don't exist pre-complaint, where someone says, I did it, I'm glad I did it, he deserved it. So if that's what the standard was meant by, Your Honor, then we might as well just not have security litigation. But I don't think that's what it meant. So what we talk about is, we talk about in the marketing meetings, the senior-most marketing guy, one of our confidential witnesses is in that meeting and says he talks about those problems that they're having while they're bringing all these students in that they're not sticking, that they are bringing in unqualified people, and it's a real problem. He knows that. By the way, I'm also curious is, why is it when marketing is going well and sales are going well, the senior-most people and revenues coming in, they get big bonuses, huge bonuses, and I think each of these guys got 100% of what they were eligible for, and they take all the credit. And why is it when there are problems in marketing, all of a sudden the senior people have no idea what's going on, never even heard of it? There is a total lack of accountability, and there needs to be parallel accountability. If you are getting the big bucks, and you're in charge of it, and you say, I know what's going on, it's my doing, then when the problems happen, and you're in those meetings, and you're talking about the problems, you can't throw up your hands and say, I had no idea, there were just folks out there in the field doing this. And there's no evidence that there were just some random folks out in the field. Twelve confidential witnesses from all different areas saying, you set up pay structures so that people would not talk about quality, but would talk about quantity, that people at the top knew that. And you say, well, how do they know it? Do I have a memo? I don't. But they're the folks who set up the whole structure. This is the way the business runs. They're in those meetings where they're finding out about what's happening in the field. And again, confidential witness number 12 talks about that. I think it's number 11 or 12. And then, of course, there is the stock sales that the three senior people, two days after they meet with the Department of Education, who says, you know, you've got a lot of problems. We've been, you know, researching you folks, and you are preying on the most vulnerable. You are not being, you know, following federal law. You're going to lose your Title IV funding. And what happens? Two days, they dump, I think it was close to a quarter of a billion dollars worth of stock. Stock sales that they never had before, because I know the Ninth Circuit says just selling stock isn't enough. But they don't sell for three years. Two days after that meeting, bam, they start dumping stock left and right. Now, that to me is Sienta. You know something's happening. Shabrin, I see you're down to about two and a half minutes. I'd better quit now. Thanks. Thank you, sir. Good morning. Good morning, and may it please the Court. I'm Linda Coberly here for the defendant appellees, both the Apollo group and the individual defendants. First of all, I just, in the sense of recency, want to start where Mr. Grant left off, which is with this suggestion that there was a great stock dumping by people who hadn't sold in years after this information came from the Department of Education. I want to direct the Court's attention to page 142 of the excerpts of record, which is the complaint, in paragraph 257, in which the plaintiffs set out the actual sales history of the individuals who sold stock. And just to take a step back, we have nine individual defendants here. Only four of them sold any stock during the four-year class period. Of those four who sold, the most any of them sold was less than roughly a third of his holdings. The two most senior executives sold far less than that. And if you look at the chart on page 257, you will see that the period of stock sales we're talking about down here, there were lots of stock sales in the prior three years. So what you've just heard, that these sales came out of the blue and there had never been sales before, is simply not true looking at the complaint. You'll see that there were sales during the week of this discussion with the Department of Education, but they were sales during exactly the same period in the prior year and really consistently throughout the class period. The upshot of the stock sale issue they were, they were very small sales. They were spread, you'll see from the chart, spread throughout the class period. There was, of course, constant contact between this organization and the Department of Education because it's a highly regulated industry. And the particular news that was discussed on that particular call didn't lead to any material problem for the company, disclosure or anything. So these were dribbles of sales and it's simply not true to suggest that there was a vast amount of sales for the first time after that. It's just not true according to their complaint. So what you're saying, those specific facts don't strongly suggest actual intent. I believe that's exactly right, Your Honor. But let's take, taking a step back to where Mr. Grant began, this is a securities fraud case. And these plaintiffs have to plead that they, as investors, were defrauded. And they had two chances to do that and they couldn't do it. The District Court properly dismissed their case with prejudice just as the courts did in seven other suits against seven other companies filed around the same time based on essentially the same allegations. So what led to all this? Well, in 2010, the regulatory environment changed for for-profit education. There was a Senate committee hearing and it became clear that the Department of Education was going to change the rules. And when that risk materialized, and it, by the way, was a risk that had always been disclosed, this is a highly regulated industry and the rules can always change and that could have a negative effect. Apollo actually got ahead of it and made some changes to its business to anticipate the rules that came into effect later on. In October 2010, the one disclosure that the plaintiffs point to as causing a more significant stock drop, the earlier ones caused very small, you know, 5 percent changes in stock price, but it was the October 2010 one that they claim caused the bulk of the damages here. The announcement that took place then was an announcement of forward-looking business changes, specifically changes that were designed to change the mix of enrolled students in favor of more experienced students. And that included a mandatory three-week pre-enrollment orientation program. Now, Apollo believed, as anybody would, that that kind of program would decrease enrollment, and it said so at the time, and it's no surprise that its stock price declined at that time as well. But none of that shows that there was any prior statement that was fraudulent. Now, it's important, I think, to look at what was disclosed, and this is something that Judge Tilburg paid quite a bit of attention to. First of all, what was disclosed? Everyone knew from the beginning that this is an open enrollment institution. One of the missions, the central mission of Apollo Group and the University of Phoenix, is to allow access to post-secondary education to people who either cannot or would not, for whatever reason, be able to access traditional post-secondary education. And in order to do that, and admissions policies posted prominently on the website, the University of Phoenix admits anyone who applies who has a high school diploma or the equivalent, period. There's no other scrutiny applied at the admission stage, and everyone knew that from the beginning. What else was disclosed? Graduation rates. Those are published annually on the website and in the 10-K. Retention rates are disclosed and, in fact, must be disclosed according to federal law. There was also disclosure about the increased retention risk of a shift toward associate's programs. In 2008, Apollo disclosed that, and I'm quoting, in recent years the proportion of our degree enrollment composed of associate's degree students has increased and may continue to increase in the future. This has already led to an increase in student loan defaults, and it could lead in the future to lower retention rates. And I particularly want to talk about the role of marketing. The theme you hear in the opening brief is there was no reference to marketing. I believe Mr. Grant said today there were no disclosures about the role of marketing until 2010. Well, I beg to differ with that. In the 2007 10-K, Apollo said that its strategy for growth depends in part on managing attrition rates as well as increasing student enrollments. To attract more students, we must develop and implement marketing and student recruitment programs, which may not succeed. That was 2007. Again in the 2007 10-K, and this is at supplemental excerpts of Record 126, the 10-K discusses an investment in product and development and marketing and lead generation to ensure our continued growth. In the 2009 10-K, which is at excerpts of Record 62 quoted in the complaint, and this is released because of the fiscal year in 2009, Apollo said we believe the enrollment growth is primarily attributable to continued investments, et cetera, in offerings and academic quality and to enhancements in our marketing capabilities. Again, that's in 2009. Throughout the class period, throughout, Apollo's financial reporting reported the amount of money that was spent on marketing. And you can see at supplemental excerpts of Record 140, the amount of money spent on recruiting, sales, marketing, which is all one bucket, grew proportionally each year. So by 2009, for every dollar that was spent on instruction, $0.60 was spent on something called selling and promotional. So this idea that it was a shock in late 2010 to learn that Apollo and the University of Phoenix were focusing to a significant extent for their growth and profitability going forward on marketing, sales, is simply not supported by the allegations in the complaint. On the issue of Sienter, in addition to the very well-written opinion in Glaser, which we submitted in a 28-J letter in Cohen, which reaffirmed yet again the standard in the Ninth Circuit for deliberate recklessness. Of course, recklessness is enough to plead Sienter, but the standard for recklessness, as the Court said in Cohen, is actually much closer to one of intent. There is simply nothing like that here. There are, of course, 12 confidential witnesses. Well, we say that we look at the degree of recklessness. Yes. And whether that strongly suggests actual intent. Correct. So it's a recklessness that's going to trigger. It is a recklessness. Well, of course, you could establish Sienter if you could allege actual knowledge. But you could also allege it by recklessness, but only if it approaches actual intent. Mr. Grant mentioned a number of times the confidential witnesses, and there are 12. Only one of them discusses a significant conversation with management. Only one. That one conversation refers to generally concerns being raised about the University of Phoenix's marketing to unfit students who might have low retention. First of all, whether a student is unfit is a matter of opinion. And, of course, as I mentioned earlier, there is no concept in the enrollment process of evaluating whether a particular student is fit or unfit, nor would any investor expect there to be, because of the mission of this organization, which is open enrollment and open opportunity for education. But on top of that, even that one meeting, that one confidential witness who speaks about a meeting with management doesn't talk about who raised what, who said what. He simply speculates about everyone was aware. These are not the kinds of allegations that can support a strong inference of Sienter. There must be factual allegations, who said what, who heard what, and what was discussed, and that we simply don't have that here. And in particular, we don't have it when you examine what sorts of things were, in fact, disclosed. The confidential witnesses are important as well with respect to the financial misrepresentation claim, the idea that the financial statements were misstated. I should point out that at no point in the class period were any of these financial statements restated. The allegations in the complaint have to do with bad debt reserves, which of course are a matter of subjective opinion. By definition, a bad debt reserve is management's estimate of what its write-ups are going to be in the future. What exactly is the defect in their allegation with respect to the financial reserves? Well, there are a number. First of all, there's no detail in them at all. It's simply an allegation that they were lower than they should have been. So I would submit they don't even satisfy Rule 8 as described in Iqbal, much less Rule 9b. How would they get that information at this stage in the case? They would have one of the they have apparently access to 12 confidential witnesses. Somebody's got to steal the books? No. You could have a person come forward who's a confidential witness who says, I was in a meeting with the financial people, and they said, boy, these reserves are understated, but we're going to go ahead with them anyway. Well, even that doesn't tell us how much, when, where. So what I don't, I mean, Mr. Grant makes the point that you're basically asking him to do the impossible with respect to this allegation at this stage in the case. I'm asking him to do what this Court has asked him to do. In the Vantive case, this Court said that the plaintiff needs to make, quote, a sufficient allegation of the amounts by which revenue was, were allegedly overstated. In Dow in 2005, this Court said the plaintiff needs to allege, quote, the approximate amount by which revenues and earnings were overstated so that the Court knows whether it constituted widespread and significant inflation of revenue. There are no numbers in this complaint at all. Could he amend? Should he be given leave to amend to do that? No, because there's no, he's already, first of all, had one opportunity for leave to amend. There's no limit on the number, though. Well, no, that's true. But this, there's nothing new about this case law. I mean, this has been the case from the beginning. And the only allegations he has offered to support his claim of financial misrepresentation is based on material that was publicly disclosed. He says, what were the, what were the, what made those misstatements false, he says, is that Apollo knew that it was harder to collect from students who had already withdrawn. But that was disclosed. The plaintiffs knew that, too. So you can't create an inference that there was a misstatement, a knowing or reckless misstatement by management by pointing simply at information that the plaintiffs themselves also had. There are a couple of other problems with this, too, by the way. I have a question. Yes. Isn't the problem that Mr. Grant has and that my colleague has mentioned the very one that one always hears about Iqbal Twombly? Yes. It has resulted in shutting down the Federal Courts' access for certain types of suits. Mr. Grant himself made reference to that. It's very difficult for people to get specifics in advance. But nonetheless, our judicial and legislative leaders in their wisdom have so declared. Isn't that really what we're dealing with? I think that is exactly what we're dealing with, Your Honor. And there are, and I'm sure this panel has seen, many cases where there are allegations made that talk about numbers, that talk about here's what the judgment should have been under GAP for this particular number. Here's a confidential witness who said there was real concern about this issue that wasn't disclosed by the numbers. We see those cases with those allegations, and they are totally missing here. The other issue we have with those alleged misstatements, again, is no loss causation. There was never a disclosure that any prior statement was false. Again, there was no restatement here. And I should point out that in Metzler, which, you know, it's unusual to have the leading precedent in a case be on facts that are so close to the case that you have before you. But the Metzler case dealt, it was 2008, it dealt with really very similar allegations against another for-profit education company, allegations about misstatements, about recognition of revenue, the true source of growth, et cetera. And in that case, there actually had been a restatement of financial statements, and still the Court held that there was no falsity, no loss causation, no scienter, because the fact is it is difficult to plead a case under the Federal securities laws. That's the law of this Court, and it's the law that the Supreme Court has laid down. Thank you. Thank you very much. Thank you. Mr. Grant, you get the last word. Your Honors, there's nothing wrong with marketing and attempting to increase student enrollment at all. And, yes, that was acknowledged. But what wasn't acknowledged is that or what was acknowledged was that the success we're having in that effort is because we are turning out a quality product, the students are satisfied, we're giving a great education. That's the misstatement. Because what was not said was, well, we are putting in a huge amount of effort, $0.60 on every dollar that goes to education, $0.60 goes to marketing, and if that student has a heartbeat, we'll take them. Even though we have a high level of confidence that student is doomed to success, to failure, even though we know that that student is going to have to borrow a ton of money, which won't be able to be discharged in bankruptcy, so we're really preying on people, and that we will ultimately have to repay those loans, we being University of Phoenix, because otherwise we will get cut off from federal aid. None of that is talked about. So while there is no shock that there's an emphasis on marketing and sales and recruitment, there is no honest discussion about what are we doing in this effort to bring people in, and, in fact, there are falsehoods at saying we're turning out a quality product. The reality is the complaint is filled with examples of that it's not a quality product, you're bringing in homeless, you're bringing in people who don't own a computer classes, it's awful what these folks do. And then I'm told, well, what happened out there is that Apollo got ahead of the industry. That's not in the complaint. That's their own view. Maybe in a trial they can prove that. And they said, because we got ahead of the industry, we made an announcement that we were changing a lot of the things that we were doing, and that resulted in a dramatic stock price. That was loss causation. It showed that their prior enrollments were inappropriate. It showed what they were doing and not disclosing or covering up by positive disclosures was a bad thing, and they had to change it. And when they changed it, the stock price dropped. Now, they can tell us, well, we publish graduation rates, we publish retention rates. That's all in hindsight, and that comes out multiple years after the fact. Your Honor, I think the question we have to ask is how does one plead this case? What could I have done other than gotten someone who breached his fiduciary duty and stole the financial materials and turned it over to me? What could we have done to plead this case? And if, you know, if the Supreme Court has said, well, that's what you've got to do, you've got to find someone who steals the financial information and turns it over to a plaintiff's counsel in breach of their own duties, then let's at least say that in an opinion so everybody knows it. But otherwise, we've got to find a way that when you have these kinds of facts that we have here that this case can move forward. I refer you to an interesting law review article by Professor Arthur Miller, I think in the New York, NYU Law Review, dealing with cutting back the Federal jurisdiction, and he deals rather specifically with the point that you make. From a policy perspective, you may very well have a good point, but we have to deal with what we've got in terms of the law. I understand, Your Honor. Thank you. Mr. Grant, thank you. Ms. Goverly, thank you. The case just argued and submitted will stand in recess for the week.
judges: Wallace, Silverman, Smith